IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LORITA L. LAJOUJ, individually and as personal representative of DANNY LAJOUJ, deceased, and as next of friend of ALTHA LAJOUJ, DANIEL LAJOUJ, MANNY LAJOUJ, PENITA LAJOUJ, KIOBI LAJOUJ, and TORI LAJOUJ, minors,<br><br>　　　　Plaintiffs,<br><br>　　　　vs.<br><br>KWAJALEIN RANGE SERVICES, LLC, BECHTEL NATIONAL, INC., BECHTEL CORPORATION, UNITED STATES OF AMERICA, UNITED STATES ARMY KWAJALEIN ATOLL, UNITED STATES ARMY, DEPARTMENT OF DEFENSE, and DOES 1-100,<br><br>　　　　Defendants. | ) Civ. No. 08-00082 ACK-KSC<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER GRANTING THE FEDERAL DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

### PROCEDURAL BACKGROUND

On February 22, 2008, Lorita L. Lajouj, individually and as personal representative of Danny Lajouj, deceased, and as next of friend for minors Altha Lajouj (aka Alta Kiluwe), Daniel Lajouj, Manny Lajouj, Penita (aka Benita) Lajouj, Kiobi Lajouj, and Tori (aka Dorie) Lajouj (collectively "Plaintiffs"), filed a Complaint in this Court ("DCHI Complaint") against Kwajalein

1

Range Services, LLC ("KRS"), Bechtel National, Inc., Bechtel Corporation (collectively "the KRS Defendants"), United States of America ("United States"), United States Army Kwajalein Atoll ("USAKA"), United States Army, Department of Defense (collectively "the federal Defendants") and Does 1-100 (collectively "Defendants").[1]  Plaintiffs allege that various negligent acts and omissions by Defendants caused Danny Lajouj's injuries, death, and damages in an explosion aboard the LCU 1667 Manassas vessel ("LCU Manassas") on February 24, 2006.  See DCHI Compl. ¶¶ 21, 36.

On March 21, 2008, Defendants KRS, Bechtel National, Inc., and Bechtel Corporation (collectively "the KRS Defendants") filed a Motion to Dismiss on the grounds of forum non conveniens ("FNC Motion"), in favor of litigation in the courts of the Republic of the Marshall Islands ("RMI").[2]  A hearing on the FNC Motion was held on May 19, 2008.  The Court took the FNC Motion under advisement and ordered the United States to file any contemplated motion to dismiss within two weeks.[3]  The Court

---

[1] On February 22, 2008, this Court issued an Order granting Plaintiff Lorita L. Lajouj's ex parte motion for appointment as next of friend for the minor Plaintiffs.  The magistrate judge issued an identical Order on February 25, 2008.

[2] On May 19, 2008, the United States filed a Statement of No Opposition to the FNC Motion.

[3] The Court's ruling on the FNC Motion is set forth in a separate Order.

further directed the parties to file supplemental memoranda to address certain issues by June 16, 2008.[4]

On June 2, 2008, the United States, on behalf of the federal Defendants, filed the instant Motion to Dismiss for Lack of Subject Matter Jurisdiction ("SMJ Motion").[5]  Included in the SMJ Motion were the United States's supplemental responses to issues raised by the FNC Motion.  On June 16, 2008, Plaintiffs filed an Opposition to the SMJ Motion ("Opposition").  That same day, Plaintiffs and the KRS Defendants filed their supplemental memoranda regarding the FNC Motion.  On June 23, 2008, the United States filed a Reply in support of its SMJ Motion ("Reply").[6]

---

[4] Specifically, the Court instructed the parties to address the following issues:

> 1.  Whether the United States is subject to admiralty jurisdiction in the District of Hawaii and/or the RMI;
> 2.  Whether admiralty law would apply in this case where the ship was in dry dock at the time of the accident;
> 3.  Whether the United States consented to this suit in admiralty;
> 4.  Whether the incident alleged in Plaintiffs' Complaint constituted a "commercial activity";
> 5.  Whether the Court can grant the FNC Motion if the RMI does not have jurisdiction over the United States; and
> 6.  Whether the naming of the personal representative in the RMI is sufficient for this case filed in the District of Hawaii.

[5] The KRS Defendants filed a Statement of No Opposition to the SMJ Motion on June 16, 2008.

[6] That same day, the KRS Defendants filed a Supplemental Memorandum to amend their responses to questions 2 and 6 after

The Court held a hearing to address the SMJ Motion on July 3, 2008.[7]

## FACTUAL BACKGROUND[8]

This case arises out of an incident that occurred on the LCU Manassas vessel while it was undergoing a major vessel overhaul.  See DCHI Compl. ¶¶ 2, 21.  Plaintiffs assert that the vessel was in "dry dock" while undergoing repairs.  See id. ¶ 21. The United States, however, contends that the vessel was not in "dry dock" but rather was "on a cradle on a marine railway."  See SMJ Motion at 10.  In any event, the parties agree that the vessel repair was taking place on USAKA, a military base located on the Kwajalein Atoll in the RMI.[9]  See DCHI Compl. ¶ 2; SMJ Motion at 2.  USAKA houses the Ronald Reagan Ballistic Missile Defense Test Site.  DCHI Compl. ¶ 2.  USAKA is managed and operated by KRS, a joint venture of Defendant Bechtel National,

---

having received a copy of the complaint that Plaintiffs filed in the RMI.

[7] After the hearing, on July 7, 2008, the United States filed a Supplemental Memorandum regarding admiralty jurisdiction in response to issues raised at the hearing.  Per the Court's request, Plaintiffs also provided the Court with copies of the letters denying their administrative claims.

[8] The facts as recited in this Order are for the purpose of disposing of this motion and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

[9] Kwajalein is located 2,100 nautical miles southwest of Honolulu, Hawaii and is the world's largest coral atoll.

4

Inc. and non-party Lockheed Martin Services, Inc.   Id. ¶ 8.   At
the time of the incident, Plaintiff Danny Lajouj ("Lajouj") was
employed by the Chugach Development Corporation ("Chugach"), a
major subcontractor to KRS.   Id. ¶¶ 7, 21.

On February 24, 2006, Lajouj was working below the deck
of the LCU Manassas when he was killed in an explosion.   Id. ¶
21.   As part of a planned project reportedly authorized by
Defendants, Lajouj had been spray painting in a confined space
inside the port ballast.   Id. ¶ 22.   Plaintiffs allege that the
area was inadequately ventilated and became saturated with a
highly combustible atmosphere from the spray paint.   Id.   Lajouj
was using a "drop light"[10] for illumination while he worked.   Id.
¶ 23.   As he finished the task and turned to leave through a
narrow hatchway, the drop light broke.   Id.

The broken lightbulb in the drop light sparked an
instantaneous explosion.   Id.   The force of the explosion
propelled Lajouj ten feet away into the starboard ballast area
bulkhead.   Id. ¶ 24.   He suffered a skull fracture, severe
thermal burns over his body, and death.   Id.

On February 8, 2008, the High Court of the RMI
appointed Lajouj's wife, Lorita L. Lajouj, as his personal
representative for the purpose of pursuing a wrongful death

_____

[10]   A "drop light" is "an electric light suspended by a cord
or on a portable extension."   See Webster's Ninth New Collegiate
Dictionary at 385 (1986).

action under Marshallese law.  Id. ¶ 5.  On February 22, 2008,
Plaintiff Lorita L. Lajouj filed a complaint in the High Court of
the RMI ("RMI Complaint") on behalf of decedent Lajouj, herself,
and their six minor children.  Id. ¶¶ 3-6.  That same day,
Plaintiffs submitted administrative claims under the Federal Tort
Claims Act ("FTCA") and the Foreign Claims Act ("FCA").  See
Declaration of Plaintiff's Counsel Joseph P.H. Ahuna, Jr. ("Ahuna
Decl.") ¶ 3.

     Plaintiffs also filed the instant lawsuit in this Court
on February 22, 2008.  In the DCHI Complaint, Plaintiffs allege
that Lajouj's injuries, death, and damages were caused by various
negligent acts and omissions by Defendants, such as, inter alia:
failing to implement proper mitigating controls for dangerous
workplace conditions; failing to establish and enforce workplace
safety and health programs and standards; failing to provide
adequate air ventilation in the area where Lajouj was working;
supplying Lajouj with a non-explosive-proof drop light and
failing to provide an explosive-proof drop light; failing to
implement controls to prevent the build-up of a flammable
atmosphere from the spray paint; failing to inform Chugach
employees of safety and health hazards; failing to enforce on-
site safety rules; failing to perform a job hazard analysis;
failing to comply with the "Confined Space Entry" certification
program; and failing to inspect the job site and eliminate

dangerous conditions on the LCU Manassas.  See DCHI Compl. ¶ 37.

      In a letter dated April 16, 2008, the U.S. Army Claims
Service (the "Service") responded to Plaintiffs' request for
administrative review.  See Letter from U.S. Army Claims Service
to Plaintiffs' Counsel (Apr. 16, 2008) ("Apr. 16, 2008 Letter");
Ahuna Decl. ¶ 4.  The Service explained that Plaintiffs' claims
were considered under the FCA, in accordance with relevant
provisions of the Compact of Free Association ("Compact")
executed by the RMI and the United States, the Status of Force
Agreement concluded pursuant to § 323 of the Compact, and the
"Agreed Minutes" to the SOFA.  See Apr. 16, 2008 Letter.
According to the Service, the FTCA was "not applicable because it
excludes claims arising outside the United States."  See id.;
Ahuna Decl. ¶ 4.  The Service denied Plaintiffs' FCA claim
"because the FCA, as implemented by [Army Regulation] 27-20,
Claims, Chapter 10, prohibits payment to contractor employees or
their dependants for whom benefits are provided under any
workers' compensation law."  See Apr. 16, 2008 Letter; Ahuna
Decl. ¶ 5.  The Service noted that Plaintiffs have received a
$3,000 burial payment and weekly payments of $159.82 as worker's
compensation benefits under the Longshore and Harbor Workers'
Compensation Act ("LHWCA") through Chugach, Lajouj's employer.
See Ahuna Decl. ¶ 5; Apr. 16, 2008 Letter; Opposition at 13.
Moreover, the Service determined that there was no evidence of

negligence on the part of the United States because the United States was not involved in assigning work or selecting the lights that Lajouj used on February 24, 2006.[11]  See Apr. 16, 2008 Letter.

### STANDARD

A court's subject matter jurisdiction may be challenged under Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"). "A party invoking the federal court's jurisdiction has the burden of proving the actual existence of subject matter jurisdiction." See Thompson v. McCombe, 99 F.3d 352, 353 (9th Cir. 1996).

On a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the court is not "restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction."  McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988).  "Once the moving party [converts] the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction."  Savage v. Glendale Union High Sch., 343

---

[11] Plaintiffs subsequently requested reconsideration of the Service's denial of their claims.  Plaintiffs were informed that their request would be held in abeyance until the completion of this litigation.  See Letter from U.S. Army Claims Service to Plaintiffs' Counsel (June 3, 2008).

F.3d 1036, 1040 n.2 (9th Cir. 2003).

"The requirement that the nonmoving party present evidence outside his pleadings in opposition to a motion to dismiss for lack of subject matter jurisdiction is the same as that required under Rule 56(e) that the nonmoving party to a motion for summary judgment must set forth specific facts, beyond his pleadings, to show that a genuine issue of material fact exists." Trentacosta v. Frontier Pac. Aircraft Indus., Inc., 813 F.2d 1553, 1559 (9th Cir. 1987).  When ruling on a jurisdictional motion involving factual issues which also go to the merits, the moving party "should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Casumpang v. Int'l Longshoremen's & Warehousemen's Union, 269 F.3d 1042, 1060-61 (9th Cir. 2001).

## DISCUSSION

The United States seeks dismissal of the DCHI Complaint for lack of subject matter jurisdiction.  Specifically, the United States asserts that this action is precluded by the limited waiver of sovereign immunity in the Compact and the SOFA. In response, Plaintiffs contend that the general waiver of sovereign immunity for admiralty cases permits this claim against the United States.  The Court must determine which waiver of sovereign immunity is controlling in this lawsuit.

The Court first reviews general principles of sovereign

immunity before turning to the relevant provisions of the
Compact, the SOFA, and the FCA.   The Court then considers whether
the requirements of admiralty jurisdiction are met and, if so,
whether Plaintiffs' claims are governed by the general waiver of
sovereign immunity for admiralty claims or by the limited waiver
of sovereign immunity in the Compact and the SOFA.

### A. Sovereign Immunity in General

As a sovereign, the United States is immune from suit
unless it has waived its immunity.   See Balser v. Dep't of
Justice, 327 F.3d 903, 907 (9th Cir. 2003) (citing Dep't of Army
v. Blue Fox, Inc., 525 U.S. 255, 260 (1999)); Gilbert v.
DaGrossa, 756 F.2d 1455, 1458 (9th Cir. 1985) (citing United
States v. Shaw, 309 U.S. 495 (1940)).   Such a waiver cannot be
implied, but "must be unequivocally expressed."   Gilbert, 756
F.2d at 1458 (citing United States v. King, 395 U.S. 1, 4
(1969)); see also Balser, 327 F.3d at 907.   Purported statutory
waivers of sovereign immunity are not to be liberally construed.
Balser, 327 F.3d at 907.   A court lacks subject matter
jurisdiction over a claim against the United States if the United
States has not consented to be sued on that claim, and dismissal
of the claim is required.   Balser, 327 F.3d at 907; Hutchinson v.
United States, 677 F.2d 1322, 1327 (9th Cir. 1982).   When the
United States consents to be sued, the terms of its waiver of
sovereign immunity define the extent of the court's jurisdiction.

Balser, 327 F.3d at 907.

**B.    The RMI Compact and SOFA**

The United States asserts that pursuant to the Compact and the SOFA, claims against the United States that are related to the actions of its military are subject to resolution solely through the administrative settlement process in the FCA.  Before navigating the maze of sources that lead the Court to agree, some brief background information is necessary.

"As presently constituted, the [RMI] is a fully independent, sovereign nation."  Gushi Bros. Co. v. Bank of Guam, 28 F.3d 1535, 1539 (9th Cir. 1994) (quoting Temengil v. Trust Territory of the Pacific Islands, 881 F.2d 647, 650 (9th Cir. 1989), cert. denied, 496 U.S. 925 (1990)).  In 1986, the United States Congress adopted the Compact of Free Association Act of 1985, which approved a Compact of Free Association between the United States and the governments of the RMI and the Federated States of Micronesia.  See Pub. L. No. 99-239, 99 Stat. 1770 (1986); 48 U.S.C. § 1921; Guerrero v. Clinton, 157 F.3d 1190, 1191 (9th Cir. 1998); see also Juda v. United States, 13 Cl. Ct. 667, 670-71 (1987) (providing a detailed history of the relationship between the United States and the RMI).  The Compact currently governs relations between the United States and the RMI.  Gushi Bros. Co., 28 F.3d at 1539.   In 2003, the Compact was amended.  See Pub. L. No. 108-188, 117 Stat. 2795 (2003).

The amended version of the Compact was in effect in February 2006, when the explosion on the LCU Manassas took place.

The Compact's main provision regarding sovereign immunity is found in the amended § 174(d).  Section 174(d) provides:

> The Government of the Republic of the Marshall Islands shall not be immune from the jurisdiction of the courts of the United States, and the Government of the United States shall not be immune from the jurisdiction of the courts of the Republic of the Marshall Islands in any civil case in which an exception to foreign state immunity is set forth in the Foreign Sovereign Immunities Act (28 U.S.C. 1602 et seq.) or its successor statutes.

In other words, this provision waives the sovereign immunity of the United States <u>in the RMI courts</u> in civil cases where FSIA exceptions apply,[12] and waives the sovereign immunity of the RMI in the federal courts.  Notably, § 174(d) does not address the extent to which the United States has consented to suit in the federal courts.

That question is resolved by delving deeper into the Compact and the SOFA concluded pursuant to § 323 of the Compact. Section 323 of the Compact provides:

---

[12] The parties appear to agree that the exceptions in the FSIA are irrelevant to the question of whether <u>this</u> Court has jurisdiction over the United States (as opposed to the RMI court).  For the sake of clarity, the Court simply notes that the FSIA provides exceptions to the jurisdictional immunity of a foreign state for, <u>inter</u> <u>alia</u>, cases arising out of commercial activity, or where money damages are sought for personal injury or death, for acts occurring within the United States or having an effect in the United States.  <u>See</u> 28 U.S.C. § 1605.

> The military operating rights of the Government of the United States and the legal status and contractual arrangements of the United States Armed Forces, their members, and associated civilians, while present in the Republic of the Marshall Islands are set forth in separate agreements, which shall remain in effect in accordance with the terms of such agreements.

In turn, Article XV of the applicable SOFA states in relevant part:

> 1. The authorities of the Armed Forces of the United States shall pay just and reasonable compensation in settlement of meritorious non-contractual claims arising out of acts or omissions occurring . . . subsequent to the effective date of this Agreement in the Marshall Islands . . . of members of the force; of members of the civilian component; and, if the act or omission was done in the performance of official duty, of local-hire personnel[13] who are employed by the Armed Forces of the United States.   All such claims shall be processed and settled by the authorities of the Armed Forces of the United States in accordance with the laws and regulations of the United States. . . .
> \*          \*          \*
> 6. Pursuant to Section 174 of the Compact, all claims within the scope of Section 174 of the Compact shall be settled exclusively in accordance with the provisions of this Article.

The Agreed Minutes to the SOFA provide further clarification:

> <u>Article XV, Claims</u>: The Signatory Governments do not intend that paragraph 6 of Article XV preclude the operation of Section 174 of the Compact, provided that paragraph 5 of Article XV governs the

_____

[13] The SOFA defines "Local Hire Personnel" as "citizens and nationals of the Marshall Islands . . . who are employed in the Marshall Islands . . . by the Armed Forces of the United States or United States Contractors." <u>See</u> SOFA, Article I.2(f).

operation of Section 174©) of the Compact.  The import of paragraph 6 of Article XV, read with paragraph I of Article XV, is as follows:
— All claims within the scope of paragraph 1 of Article XV which arise after the effective date of this Agreement shall be processed and settled exclusively pursuant to the Foreign Claims Act, 10 U.S.C. 2734, and any regulations promulgated in implementation thereof.

(Emphasis added).  To summarize, the SOFA dictates that all meritorious non-contractual claims arising out of acts or omissions by members of the armed forces or local-hire personnel in the RMI must be settled exclusively pursuant to the FCA. Despite Plaintiffs' attempt to recharacterize their claims as contractual, see Opposition 13-14, the Court finds that the allegations in the DCHI Complaint sound in tort law, not contract law.

The FCA provision referenced in the Agreed Minutes to the SOFA, 10 U.S.C. § 2734, is titled "Property loss, personal injury or death: incident to noncombat activities of the armed forces; foreign countries."  See Pub. L. No. 83-734, 68 Stat. 1006, codified as amended at 10 U.S.C. §§ 2734a-2734b.  In pertinent part, § 2734 states:

(a) To promote and to maintain friendly relations through the prompt settlement of meritorious claims, the Secretary concerned, or an officer or employee designated by the Secretary, may appoint, under such regulations as the secretary may prescribe, one or more claims commissions, each composed of one or more officers or employees or combination of officers or employees of the armed forces, to settle and pay in an amount not more than $100,000, a claim against the United States

14

for-

\*      \*      \*

(3) personal injury to, or death of, any inhabitant of a foreign country;

if the damage, loss, personal injury, or death occurs outside the United States, or the Commonwealths or possessions, and is caused by, or is otherwise incident to noncombat activities of, the armed forces under his jurisdiction, or is caused by a member thereof or by a civilian employee of the military department concerned or the Coast Guard, as the case may be. . . . In this section, "foreign country" includes any place under the jurisdiction of the United States in a foreign country.

As explained by the district court in Saltany v. Reagan, the FCA permits "administrative claims to be made to the U.S. government for injury to persons or property abroad caused by its armed forces other than in combat." See 702 F. Supp. 319, 321 n.4 (D.D.C. 1988), aff'd in part and rev'd in part, 886 F.2d 438 (D.C. Cir. 1989), cert. denied, 495 U.S. 932 (1990).[14] Significantly, the FCA "not only fails to contain an express waiver of sovereign immunity, but also contemplates no judicial review of the denial of a claim." See Saltany, 702 F. Supp. at 321 n.4 (citing Broadnax v. United States Army, 710 F.2d 865 (D.C. Cir. 1983)).

Reading together the relevant provisions of the Compact, the SOFA, the Agreed Minutes to the SOFA, and the FCA, the Court must conclude that the limited waiver of sovereign

---

[14] The D.C. Circuit affirmed the district court's rulings on the FCA but reversed its denial of Rule 11 sanctions against the plaintiff. See Saltany, 886 F.2d at 441.

immunity under the FCA applies to Plaintiffs' claims.  Plaintiffs are seeking redress from the United States for Lajouj's personal injuries and death arising out of the non-combat activities of the armed forces on USAKA.  Thus, under the FCA, Plaintiffs are afforded only an administrative remedy for their claims against the United States.[15]  See 10 U.S.C. § 2734; see also Moore v. United Kingdom, 384 F.3d 1084, 1087 (9th Cir. 2004) (stating that the FCA provides the remedy for the resolution of claims that are the subject of international agreements and SOFAs).

Plaintiffs do not appear to dispute the applicability of the Compact and the SOFA, but argue that the FCA is inapplicable because the Service already denied their FCA claim; therefore, the FCA affords them no remedy at all.  This reasoning is flawed.  The Service's denial of their FCA claim does not mean the FCA is inapplicable.  Rather, the Service fully considered the merits of Plaintiffs' claim under the FCA and found that they were not entitled to any recovery from the United States because they were already receiving worker's compensation benefits through Lajouj's employer.  See Apr. 16, 2008 Letter.

Plaintiffs further contend that the FCA is inapplicable because Lajouj's injuries and death "arose out of a breach of

---

[15] This is not to say, however, that Plaintiffs have no remedy at all.  Plaintiffs may be limited to the administrative remedy in the FCA with respect to the United States, but they are not so limited with respect to the non-federal KRS Defendants.

safety requirements and protocols in a contract" between the United States and the KRS Defendants.  See Opposition at 13. Plaintiffs argue that Lajouj was a beneficiary of the contract as an employee of Chugach, a subcontractor of KRS.  The Court notes that this argument plainly contradicts Plaintiffs' own references to the instant action as a "wrongful death lawsuit" and a "tort claim" in their Opposition.  See Opposition at 2, 5. Nevertheless, Plaintiffs point to several allegations in the DCHI Complaint in support of their dubious argument.  The cited allegations, however, focus on the duties and responsibilities of the various Defendants, sounding in tort law.  Moreover, the DCHI Complaint does not appear to assert any counts based on breach of contract.  While it is true that the FCA does not apply to contractual claims, none are asserted here.  Plaintiffs themselves summed up their lawsuit as follows: Defendants failed to comply with certain duties and responsibilities, which resulted in Lajouj's wrongful death.  See Opposition at 14.  The Court will not allow Plaintiffs to refashion their claims as contractual for the sole purpose of avoiding the administrative remedy in the FCA.

Likewise, the Court disagrees with Plaintiffs' alternative argument that the FCA would only apply to bar Lajouj's claim against the United States, not the claims of his wife and six children.  The FCA applies to "claim[s] against the

17

United States for . . . personal injury to, or death of, any inhabitant of a foreign country."  See 10 U.S.C. § 2734.  The statute does not differentiate between the individuals bringing such claims, except to state that the "claims of an insured, but not a subrogee, may be considered under" the FCA.  See id. Plaintiffs also misconstrue the SOFA's reference to "local-hire personnel."  Under the SOFA, claims are not restricted to local-hire personnel; rather, claims can arise out of the acts or omissions of local-hire personnel in the performance of their official duties.

Accordingly, the Court finds that pursuant to the Compact, the SOFA, and the FCA, the United States has consented to a limited waiver of sovereign immunity.  The United States permits personal injury and wrongful death claims arising out of the non-combat activities of the military in the RMI to be resolved exclusively through the FCA's administrative settlement process.

### C.   The RMI Compact/SOFA Waiver is Controlling

Plaintiffs' main argument is that notwithstanding the Compact and SOFA, the United States has consented to be sued in admiralty lawsuits.  The federal district courts have original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction."  28 U.S.C. § 1333(1); see also U.S. Const., Art. III, § 2.  "[A] party seeking to invoke federal admiralty

18

jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim

must satisfy conditions both of location and of connection with

maritime activity." Jerome B. Grubart, Inc. v. Great Lakes

Dredge & Dock Co., 513 U.S. 527, 534 (1995); see also Gruver v.

Lesman Fisheries Inc., 489 F.3d 978, 982 (9th Cir. 2007).

Plaintiffs maintain that their case meets the test for admiralty

jurisdiction[16] and the United States has consented to this

lawsuit.  Specifically, Plaintiffs argue, the United States has

waived its sovereign immunity in admiralty suits under the Public

Vessels Act[17] ("PVA") and the Suits in Admiralty Act ("SAA"), 46

U.S.C. §§ 30901 et seq.  Under the SAA, the United States has

consented to suit in any case in which, "if a private person or

property were involved, a civil action in admiralty could be

maintained."[18]  See 46 U.S.C. § 30903.

_____

    [16] Plaintiffs do not assert admiralty jurisdiction in the
RMI Complaint.

    [17] The PVA "renders the United States liable in admiralty
for 'damages caused by a public vessel of the United States' . .
. and contains a special reciprocity requirement that permits
foreign nationals to sue the U.S. government only if their
country of nationality would permit a similar suit by a U.S.
citizen." Taghadomi, 401 F.3d at 1083 (quoting 46 U.S.C. §§
31102, 31111).

    [18] In addition, Plaintiffs seemingly argue that admiralty
jurisdiction attaches because federal jurisdiction extends to
defense sites in the RMI pursuant to 48 U.S.C. § 1912(b) ("The
defense sites of the United States established in the Marshall
Islands . . . in accordance with the Compact of Free Association
and its related agreements are within the special maritime and
territorial jurisdiction of the United States as set forth in
section 7, Title 18.").  The Court first notes that the mere

The Court concludes it need not analyze whether this lawsuit meets the test for admiralty jurisdiction because even assuming it does, the Court finds that the limited waiver of sovereign immunity in the Compact and the SOFA preempts the general waiver of sovereign immunity for admiralty claims.[19]

---

availability of federal admiralty jurisdiction does not automatically mean that Plaintiffs have stated a cognizable admiralty claim. Rather, Plaintiffs must still satisfy the location and connection tests. See Jerome B. Grubart, Inc., 513 U.S. at 534. The Court adds that the fact that 48 U.S.C. § 1912(b)(3) specifies this district for criminal matters weighs against the Court's jurisdiction over civil matters. If this district was specially intended to hear civil matters arising out of the defense sites in the RMI, the statute would have so specified. Furthermore, § 1912 does not apply to Plaintiffs. Section 1912(a) provides that the jurisdictional provisions in subsection (b) apply "only to the citizens and nationals of the United States and aliens lawfully admitted to the United States for permanent residence who are in the Marshall Islands." See 48 U.S.C. § 1912(a) & (b). Plaintiffs are citizens and residents of the RMI; they are not citizens of the United States or aliens lawfully admitted to the United States who happen to be in the RMI. Finally, Plaintiffs' reading of 18 U.S.C. § 7, a criminal statute, is strained and otherwise unhelpful to this Court's analysis.

[19] In their briefs, the parties focus almost exclusively on the location prong of admiralty jurisdiction. The United States argues that the location requirement cannot be satisfied because at the time of the explosion, the LCU Manassas was located on land in a cradle on a marine railway - not, as Plaintiffs assert, in dry dock. See SMJ Motion at 10. Photographs of the vessel appear to support the United States's position. See Declaration of R. Michael Underhill at Exhibits B-E. Plaintiffs counter that for the purposes of admiralty jurisdiction, any distinction between a dry dock and a cradle on a marine railway is irrelevant. Although the Court need not resolve this dispute, the Court simply points out that in the cases analyzing the LHWCA, courts have found that the term "dry dock" includes a marine railway. See Avondale Marine Ways v. Henderson, 346 U.S. 366 (1953) (per curiam) (Burton, J., concurring) (explaining that a marine railway is one of three types of dry docks and noting

More specifically, the Court concludes that Plaintiffs cannot proceed in admiralty because the FCA provides the exclusive administrative procedure for resolving claims against the United States for personal injury and death arising out of the non-combat activities of the military in the RMI.

In so holding, the Court is guided by the principle that a specific waiver of sovereign immunity trumps a general waiver of sovereign immunity.  For example, in <u>Brown v. General Services Administration</u>, 425 U.S. 820 (1976), the Supreme Court

---

that "[a] ship is no more and no less on land when it rests in a graven dry dock than when it rests on a marine railway"); <u>see also</u> 94 <u>Corpus Juris Secundum</u>, <u>Wharves</u>, § 2 (West 2008) (stating that a "dry dock and a marine railway are used for a like purpose").  However, the Court notes, as the United States asserts, there evidently is a significant difference between the LHWCA, which provides a substantive source of recovery, and admiralty jurisdiction.  <u>See</u>, <u>e.g.</u>, <u>May v. Transworld Drilling Co.</u>, 786 F.2d 1261, 1262 (5th Cir. 1986) (stating that the test for admiralty jurisdiction and the determination as to whether a plaintiff has stated a cause of action under the LHCWA are two distinct inquiries).  While it is somewhat difficult to reason why there would be a distinction between a marine railway and a dry dock for the purposes of admiralty jurisdiction, as opposed to under the LHCWA, courts have determined there is such a distinction. <u>See</u>, <u>e.g.</u>, <u>Christoff v. Bergeron Indus., Inc.</u>, 748 F.2d 297, 299 & n.2 (5th Cir. 1984) (finding that a welder who was injured on a barge that was resting on a marine railway while under construction was not injured "on navigable waters" for the purposes of federal admiralty jurisdiction, but noting that "[i]n contrast, marine railways are "'navigable waters' for purposes of worker's compensation coverage under the LHCWA").  The Court finds it interesting that the LHWCA, which originally provided compensation for injuries occurring upon "navigable waters" and included "any dry dock," was subsequently amended in 1972 to specifically include injuries occurring on "any marine railway." <u>See</u> 33 U.S.C. § 903(a) (original version at ch. 509, § 3, 22 Stat. 1426 (1927)).

considered a plaintiff's argument that the express conditions placed on the waiver of sovereign immunity under Title VII did not prevent him from asserting claims under other civil rights statutes.  Id. at 831.  In rejecting this argument, the Brown Court explained:

> In a variety of contexts the Court has held that a precisely drawn, detailed statute pre-empts more general remedies. . . . The Court has reached similar results in cases in which injured federal employees have claimed the right to proceed under facially applicable tort recovery statutes. . . . We have consistently held that a narrowly tailored employee compensation scheme pre-empts the more general tort recovery statutes.

Id. at 824-25 (internal quotations omitted).  The Brown Court held that Title VII provides the "exclusive judicial remedy for claims of discrimination in federal employment," and therefore the district court properly dismissed the case because the plaintiff failed to file a timely complaint.  Id. at 835.

The Supreme Court has reached similar conclusions in cases involving the SAA and PVA, like the one at bar.  In Patterson v. United States, 359 U.S. 495 (1995), for example, the plaintiffs were federal employees who were injured while working on government vessels, and therefore were subject to the provisions of the Federal Employees Compensation Act ("FECA"). Id. at 496-97.  Like the FCA in this case, the FECA limited the plaintiffs to an administrative remedy.  Id.  Undeterred, the plaintiffs brought suit under the general waivers of sovereign

immunity provided by the SAA and the PVA.  Id.  The Patterson

Court rejected the plaintiffs' attempt to circumvent the

administrative remedy in the FECA, noting that the "United States

'has established by [FECA] a method of redress for employees.

There is no reason to have two systems of redress.'"  Id. at 497

(quoting Johanson v. United States, 343 U.S. 427, 439 (1959));

see also Johanson, 343 U.S. at 441 (holding that when FECA is

available, it provides the exclusive remedy for injured civilian

seamen on public vessels and precludes a suit for damages under

the PVA).

        This Court emphasizes that the parties have not

identified - and the Court has not found - case law addressing

how the particular sovereign immunity provisions in the RMI

Compact and SOFA interact with other statutes.  But other courts

have examined the relationship between status of force agreements

and statutes and have determined that specific provisions of

status of force agreements are controlling.

        For example, in Moore v. United Kingdom, 384 F.3d 1079,

1083-84 (9th Cir. 2004), the Ninth Circuit examined the

relationship between the North Atlantic Treaty Organization

Status of Forces Agreement ("NATO-SOFA") and the FSIA.  The court

pointed to critical language in the FSIA ("subject to existing

international agreements") and determined that if there is a

"conflict between the FSIA and a [SOFA] regarding the

23

availability of a judicial remedy against a contracting state, the agreement prevails." Id. at 1084-85.  In the instant case, although the PVA and SAA do not explicitly refer to other international agreements, the Court finds that the same reasoning should apply.  The language in the RMI SOFA provides the more specific articulation of Plaintiffs' remedies against the United States and therefore governs.

In another instructive case, Shafter v. United States, 400 F.2d 584 (2d Cir. 1968) (per curiam), the Second Circuit affirmed the district court's decision in a one-sentence ruling. The district court had considered whether crew members whose fishing boat collided with a United States vessel in the territorial waters of the Federal Republic of Germany could bring a lawsuit against the United States under the PVA.  See Shafter v. United States, 273 F. Supp. 152, 153 (S.D.N.Y. 1967).  The United States moved for summary judgment, arguing that the exclusive scheme for adjudication of claims in the NATO-SOFA divested the court of subject matter jurisdiction.  Id.  After examining the relevant provisions of NATO-SOFA, the district court found it "clear that the specific and detailed remedial apparatus under the later treaty should be deemed to substitute pro tanto for the general consent to suit under the [PVA]."  Id. at 156.  The Shafter court determined that the "specific provisions of NATO-SOFA should be read to exclude the concurrent

24

and inconsistent jurisdiction plaintiffs invoke under the [PVA],"

and thus granted the United States's motion for summary judgment.

Id.

Like the provisions of NATO-SOFA in Shafter, the

provisions of the RMI Compact and SOFA dictate a specific

procedure for resolving claims against the United States.  As

discussed above, claims against the United States for personal

injury and death arising out the non-combat activities of the

military in the RMI must be resolved administratively pursuant to

the FCA.  Plaintiffs' particular claims fall within this

category.  Like in Shafter, this Court determines that the RMI

Compact and SOFA should be read to exclude the concurrent

admiralty jurisdiction that Plaintiffs invoke under the SAA and

PVA.

Finally, the Court finds it persuasive that district

courts analyzing claims under the NATO-SOFA have generally

concluded that the remedy in the NATO-SOFA supersedes general

remedies under other statutes, including the PVA.  See, e.g.,

Eyskens v. United States, 140 F.Supp.2d 553, 559-60 (E.D.N.C.

2000) (finding that plaintiffs could not assert claims against

the United States under the FTCA because the NATO-SOFA provided

the exclusive remedy, and dismissing for lack of subject matter

jurisdiction); Brown v. Ministry of Defense of the United Kingdom

of Great Britain, 683 F. Supp. 1035, 1040 (E.D. Va. 1988)

25

(dismissing plaintiffs' admiralty claims against the U.K. and Minister of Defense for the U.K. based on provisions of the NATO-SOFA); <u>Aascov v. Aldridge</u>, 695 F. Supp. 595, 598 (D.D.C. 1988) (finding that "although plaintiffs here might prefer to sue the United States under the [FCA], NATO-SOFA requires that they file suit against the receiving state according to the laws of that state").  The Court recognizes that the claims procedures in the NATO-SOFA differ from the administrative remedy dictated by the RMI Compact, the SOFA and the FCA.  However, these cases support the conclusion that the more specific provisions of status of force agreements prevail over general statutory remedies.

In sum, the Court finds that the narrowly drawn waiver of sovereign immunity in the RMI Compact and the SOFA controls over the general waiver of sovereign immunity under the SAA and PVA.  Thus, even if Plaintiffs could meet the test for admiralty jurisdiction, their claims against the United States are restricted to the administrative procedure in the FCA.  The United States has not consented to suit in this Court under the FCA.  <u>See</u> <u>Balser</u>, 327 F.3d at 907.  Accordingly, the Court lacks subject matter jurisdiction and dismisses this action against the United States, USAKA, the U.S. Army, and the Department of Defense.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court GRANTS the federal

Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, July 23, 2008.



_____
Alan C. Kay
Sr. United States District Judge

Lajouj et al. v. Kwajalein Range Services, LLC et al., Civ. No. 08-00082 ACK-KSC, Order Granting the Federal Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction.